IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Paul Regains, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | 14-cv-9687 |
| *-vs-* | ) | |
| | ) | *(Judge Hart)* |
| City of Chicago, | ) | |
| | ) | |
| *Defendant.* | ) | |

## SECOND AMENDED COMPLAINT

Pursuant to leave of Court, plaintiff files this second amended complaint and, by counsel, alleges as follows:

1.     This is a civil action arising under 42 U.S.C. § 1983. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343.

2.     Plaintiff Paul Regains is a resident of the Northern District of Illinois.

3.     Defendant City of Chicago is an Illinois municipal corporation.

## BACKGROUND

4.     Plaintiff is required by 730 ILCS 150/3 (the "Monitoring Act") to register with the chief of police in the municipality in which he is residing or, if he is residing in the City of Chicago, with the "Registration Section" of the Chicago Police Department.

5.     Plaintiff was homeless in 2012 and living in the City of Chicago; he was therefore required by the Monitoring Act to register with the "Registration Section" every week.

6.     Failure to register is a felony, 730 ILCS 150/10(a), and noncompliance with the statute is an absolute liability offense.

### THE WIDESPREAD PRACTICE

7.     By 2012, the weekly registration requirement of the Monitoring Act had become burdensome on the Chicago police officers assigned to registration duties at the "Registration Section."

8.     To ease their workload, these officers concocted a scheme to falsely register homeless persons at a fixed address by steering homeless persons to a shelter that would accept persons required to register under the Monitoring Act.

9.     The officers required homeless persons seeking to register to return with documentation showing the shelter as their fixed address.

10.     A person registered at a fixed address is not required to register every week.

11.     The officers involved in this scheme, and their supervisors, knew that the number of homeless persons who registered using the shelter address as their residence far exceeded the capacity of the shelter.

12.     Some of the Chicago police officers assigned to registration duties disagreed with this scheme and would periodically visit the shelter to see if they could find the homeless persons who had registered using the shelter as their permanent address.

13.     If they could not find that person at the shelter, these or other officers would prepare an "investigative alert" informing any police officer who encountered the registrant that there was probable cause to arrest.

14.     Chicago police officers applied this widespread practice to plaintiff: Chicago police officers directed plaintiff to a specific shelter in April of 2012 when he sought to register as a homeless person under the Monitoring Act.

15.     The officers then registered plaintiff with a fixed residence address of that shelter and instructed him to return and re-register in July of 2012.

16.     As a result of the widespread practice described above and through no fault of his own, plaintiff was in violation of 730 ILCS 150/10(a).

17.     The above described widespread practice was known to high ranking Chicago police officers; in the alternative, high ranking Chicago police officers did not learn about the above described widespread practice because of a "code of silence" in the Chicago Police Department.

## THE CODE OF SILENCE

18.     The Chicago Police Department's "code of silence" requires police officers to remain silent about police misconduct. An officer who violates the code of silence will be severely penalized by the Department.

19.     At all relevant times, police officers were trained at the Chicago Police Academy not to break the code of silence. Officers were instructed that "Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

20.     In the case of *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that as of February 2007, "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

21.     In December 2015, Chicago Mayor Rahm Emanuel acknowledged the continued existence of the code of silence within the Chicago Police Department; Emanuel, speaking in his capacity as Mayor, admitted that the code of silence leads to a culture where extreme acts of police misconduct are tolerated.

-4-

22.     In April 2016, the City's Police Accountability Task Force found that the code of silence "is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

23.     In an official government report issued in January 2017, the United States Department of Justice found that "a code of silence exists, and officers and community members know it."

24.     On March 29, 2019, Chicago Police Superintendent Eddie Johnson publicly acknowledged the code of silence, stating that some Chicago Police officers "look the other way" when they observe misconduct of other Chicago Police officers.

25.     The same code of silence in place during the time period at issue in the *Obrycka* case and recognized by the Mayor, the Task Force, the Department of Justice, and Superintendent Johnson was also in place when the widespread practice was applied to plaintiff.

### THE ARREST AND PROSECUTION OF PLAINTIFF

26.     In May of 2012, two Chicago police officers sought to verify that plaintiff and the other persons who had registered with an address at the shelter could be found there.

27.     The officers did not find plaintiff and prepared a report.

28.     Thereafter, a Chicago police detective reviewed the report and issued an "investigative alert" informing other Chicago police officers that there was probable cause to arrest plaintiff.

29.     Plaintiff sought to re-register under the Monitoring Act on July 18, 2012.

30.     Chicago police officers arrested plaintiff on July 18, 2012 when they became aware of the "investigative alert."

31.     Following his arrest, plaintiff was charged with a felony violation of the Monitoring Act.

32.     Plaintiff remained in custody until his trial on December 3, 2013, when he was found not guilty.

33.     Plaintiff was held in custody as a result of the widespread practices described above.

34.     As a result of the foregoing, plaintiff was deprived of rights secured by the Constitution of the United States and incurred damages.

35.     Plaintiff hereby demands trial by jury.

WHEREFORE plaintiff requests that appropriate compensatory damages be awarded against defendant City of Chicago.

/s/  Kenneth N. Flaxman
KENNETH N. FLAXMAN
ARDC No. 830399
Joel A. Flaxman
200 S Michigan Ave Ste 201
Chicago, IL 60604-2430
(312) 427-3200

*Attorneys for Plaintiff*